IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MONICE MCKEE ANDERSON (TDCJ No. 1695823), | § § § § | |
| Petitioner, | § § | |
| V. | § § | No. 3:14-cv-4531-L-BN |
| LORIE DAVIS, Director Texas Department of Criminal Justice, Correctional Institutions Division,[1] | § § § § § | |
| Respondent. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
<u>UNITED STATES MAGISTRATE JUDGE</u>**

Petitioner Monice McKee Anderson, a Texas inmate, proceeding *pro se*, has filed an application for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court should deny the application for the reasons explained below.

**Applicable Background**

Anderson is serving a sentence of life without parole as a result of being convicted of capital murder in Dallas County in 2011. *See State v. Anderson*, No. F10-51906-H (Crim. Dist. Ct. No. 1, Dallas Cnty., Tex.). His criminal judgment was affirmed on direct appeal, and he did not petition the Texas Court of Criminal Appeals (the "CCA") for discretionary review. *See Anderson v. State,* No. 05-11-00259-CR, 2013

---

[1] Lorie Davis has succeeded William Stephens as Director of the Texas Department of Criminal Justice, Correctional Institutions Division, and, as his successor, she is "automatically substituted as a party." FED. R. CIV. P. 25(d).

WL 1819979 (Tex. App. – Dallas Apr. 30, 2013, no pet.). As follows are the facts underlying his conviction and sentence as summarized by the Dallas Court of Appeals:

### A. Testimony At Trial

Dallas police officer Juan Hernandez testified that on January 10, 2009, the police department received a call that someone had been shot at 8701 Lake June Road. Officer Hernandez and his partner were dispatched to the scene and upon arriving, they were met by a Hispanic man waving his hands in the air, saying someone inside the house had been shot. When Officer Hernandez went into the house, he immediately saw a man whose arm was practically blown off. It was apparent that the complainant, Rafael Duarte, was dead. Officer Hernandez was told by witnesses that three Black males were involved in the shooting. One witness also told him that a white vehicle was involved. Officer Hernandez testified he was told that one Hispanic male left the scene in a black SUV to go after the suspects. This Hispanic male later returned to the scene and spoke with detectives.

Lisa Bowers, a crime scene analyst for the Dallas Police Department, testified that she responded to the scene of the shooting to take photographs and collect evidence. Among other evidence, she collected beer bottles, a revolver found under a sofa cushion, and unfired shotgun shells. She processed the shotgun shells and beer bottles for fingerprints. Finding prints on the beer bottles, she submitted them for comparison. One fingerprint was identified as belonging to Phaylon Wamsley.

Miguel Martinez testified that on December 31, 2008, he went to a gun store to buy bullets for the shooting range. Martinez began talking to a man called "P" who was buying bullets for a .38 caliber gun. Martinez identified a photograph of Phaylon Wamsley as "P" and a photograph of Derric Elmore as the man who was with Wamsley at the gun store. Wamsley offered to sell his .38 to Martinez for $200 so Martinez followed Wamsley and Elmore to Wamsley's house to see the gun. Wamsley's gun was a .380, not a .38, so Martinez told Wamsley he did not want to buy it. During their conversation, Wamsley asked Martinez if he knew anyone who could sell him seven pounds of marijuana. Martinez called his friend Orlando Soto who said he might be able to get the marijuana. A few days later, Martinez met Wamsley and Elmore at a McDonald's restaurant. Wamsley and Elmore arrived in a white car and followed Martinez to Soto's house. Elmore stayed outside in the car while Wamsley and Martinez went inside Soto's house. After Soto called the seller, Soto,

Wamsley, and Martinez drank beer while waiting almost two hours for the seller to get to the house. Martinez testified that Soto's brother, cousin, and uncle were also in the house.

Martinez testified that Rafael Calixto and Rafael Duarte arrived at Soto's house and carried in two supermarket bags. Martinez did not look in the bags but assumed they contained the marijuana. After Calixto and Wamsley discussed the weight and price of the marijuana, Wamsley called Elmore and told him to bring in the money. Just as Martinez saw Elmore enter the house, Wamsley pulled out a gun, put it to Martinez's head, and pushed him to the ground. Wamsley put his hand in Martinez's pockets and pulled out his money, his pocket knife, and his cell phone. Martinez tried to stand up but Wamsley kicked him in the ribs. Then Martinez heard a shot from a big gun, not a pistol, and heard people running. When he got up, Martinez saw that Rafael Duarte had been shot. Martinez went outside the house, where Soto's brother was calling 911. Soto's brother was having trouble speaking English so Martinez took over the call. In the 911 call, Martinez told police that three Black males were involved.

After making the 911 call, Martinez and Soto agreed to tell the police that they were robbed but to say nothing about the drugs. Martinez kicked the door to make it look like a robbery. When the police arrived, Martinez told them that three Black males kicked in the door to gain entrance to the house and a man was shot during the robbery. Martinez did not mention the marijuana transaction. Martinez finally admitted that he initially lied to the police about what happened. The next day, Martinez went back to the police station and told the police about the drug transaction and what transpired. He told the police that he and Wamsley had exchanged several phone calls on the day of the drug deal. He could not remember Wamsley's cell phone number but he gave the police information about his own cell phone. Martinez told the police that he only saw two Black males. A few days later, the police showed Martinez lineups containing photographs of Wamsley and Elmore.

Rafael Calixto Cardenas testified that Rafael Duarte worked for him. Calixto drove Duarte to and from work. On January 10, 2009, Calixto received a call from Soto, asking if Calixto could get some marijuana for a friend. Calixto told Duarte that he was going to a house to pick up some money, and Duarte insisted on going with him. Calixto did not tell Duarte that he was actually going to deliver marijuana. Calixto drove to Soto's house and went inside. Duarte followed Calixto into Soto's house because he wanted to use the restroom. Calixto went into the kitchen with Soto,

Martinez, and a dark-skinned Hispanic-looking man Calixto had never met before [Wamsley]. About five minutes later, a young Black man came into the house. He was followed by a third man who came in and began shooting. Calixto later identified appellant as the third man. Appellant had a short, black shotgun, and yelled for everyone to get down on the floor. Calixto saw fire come out of the shotgun. Duarte was sitting on the sofa when he was shot, and Calixto saw him fall. After Duarte was shot, Calixto ran out of the house. He testified he wanted to use his truck to block the cars of the men who shot his friend. However, Calixto could not find his keys so he hid until the police arrived. Calixto talked to the police but admitted he did not initially tell the truth. He did not tell the police about the marijuana. He also did not remember first telling the police that he was not even in the house at the time of the shooting; he said there was a misunderstanding because he said he ran out of the house after the shooting. Calixto went to Duarte's house and told his wife they had been robbed and Duarte had been shot. Calixto then went to Mexico.

Detective Leopoldo Gonzalez testified that he is the homicide detective who was assigned to this case. He went to the scene, talked to the officer at the scene, and learned there were four witnesses. He interviewed the witnesses briefly at the scene and then had them taken to the police station to be interviewed further. He personally talked to Soto, while other officers talked to Calixto and Martinez. There were discrepancies in the witness statements. Later that week, Martinez came back to the police station and told the police that on the day of the offense, he had several phone conversations with one of the suspects ["P"]. Martinez told Detective Gonzalez that his cell phone number was 214-442-3971. Martinez also pointed Detective Gonzalez to a phone number, 214-723-3765, that he thought belonged to "P." Once Wamsley's fingerprints were found on one of the beer bottles at the scene, he was identified as a suspect. Martinez then identified Wamsley as the man known as "P" through a photographic lineup.

Detective Gonzalez asked for a court order for Wamsley's telephone records and text messages from phone number 214-723-3765. With the help of a list of cell tower locations from MetroPCS, Detective Gonzalez was able to determine the location from which phone calls were made. Detective Gonzalez then used Wamsley's telephone records to see who he was calling and texting at the time of the offense. The records showed that Wamsley called Elmore at 469-765-2526 during the offense. Detective Gonzalez testified that Wamsley's phone records also showed calls to another number, 214-866-9559, during the offense. According to Detective Gonzalez, during the time of the offense, calls between these

three phone numbers were hitting off similar cell phone towers.

Elmore was identified by the witnesses through a photographic lineup and arrested. When Detective Gonzalez interviewed Elmore, Elmore told him he should investigate the 214-866-9559 phone number. Subscriber information for this number listed the owner as GPHAT. Using telephone records for 214-866-9559, Detective Gonzalez called several numbers that had been called from that number. A woman answering one of Detective Gonzalez's calls told him that the 214-866-9559 number belonged to appellant. Detective Gonzalez did not initially consider appellant a suspect because Martinez told the police he only saw two suspects. Several months later, Detective Gonzalez obtained a phone number for Calixto in Mexico. Calixto told Detective Gonzalez there was a third person involved. After Calixto was interviewed by investigators from the district attorney's office, Detective Gonzalez filed a case against appellant. Appellant later told Detective Gonzalez that one of his nicknames was PHAT, and 214-866-9559 was one of his personal contact numbers.

Natoya Bell testified that on January 10, 2009, she was living with her boyfriend, Derric Elmore. She testified that she knew "P" [Wamsley], and had met appellant, nicknamed "Lil' Cuz," through Wamsley about two weeks before the shooting. On the day of the shooting, Wamsley had been at their apartment all day. When she got home from work, Elmore told her he was going to take Wamsley home and they left in her car. Elmore then sent her a text saying that he and Wamsley were going to buy some marijuana with counterfeit money. Elmore called and sent text messages to her, telling her that he would be late. She said Elmore used the phone of "Lil' Cuz" for some of the text messages and calls because Elmore's phone needed to be charged. When Elmore got back to the apartment, Wamsley and appellant were with him and they were nervous and "all out of control." Wamsley was mad and appellant was defending himself. Bell testified that Elmore told her that "Lil' Cuz" had shot one of the men they were robbing. Wamsley kept saying to appellant, "You didn't have to shoot him." Appellant told them that Duarte was going toward Wamsley so he had to shoot him. Bell testified that Wamsley gave Elmore and appellant some of the marijuana. After appellant left, Bell and Elmore drove Wamsley to his mother's house. Wamsley went into the house and returned with a grocery bag full of marijuana, compressed into bricks. Bell and Elmore drove Wamsley up the street to meet the person to whom Wamsley sold the marijuana, then drove Wamsley back home to his mother's house.

After Elmore was arrested, he called Bell from jail. He told her to talk to Detective Gonzalez and tell him that Elmore did not kill anyone. Bell then contacted Detective Gonzalez and told him everything she knew. Bell's phone calls to Elmore in jail were taped and admitted into evidence.

### B. Accomplice Testimony

The jury heard the testimony of accomplice Phaylon Wamsley. Wamsley testified that he had an agreement with the State to testify and tell the truth in exchange for a reduced charge of aggravated robbery and a reduced sentence of ten years. Wamsley identified appellant and said he called him "Lil' Cuz." Wamsley testified that he and Elmore met a "Spanish dude" named Martinez in a gun store and Martinez expressed interest in purchasing a .38 from Wamsley. After seeing the gun, Martinez did not want to buy it. But Martinez offered to sell Wamsley some marijuana. Approximately two weeks later, Wamsley and Elmore met Martinez in a McDonald's parking lot to do a drug deal. When Martinez arrived at the McDonald's, Wamsley got into his vehicle to discuss the transaction. Martinez told Wamsley that the price would be $475 per pound, instead of the $400 per pound that Wamsley was expecting. Wamsley testified that at first, it was just going to be a drug deal, but when he learned the price had increased, he and Elmore decided to rob the drug dealers and take the marijuana. Wamsley later testified that he put the robbery plan together when he was at Bell's apartment – even before he knew about the price increase. Wamsley talked to appellant, asked him if he wanted to make some money, and told him the plan. They planned to use guns because, as Wamsley testified, "you can't strong arm no drug deal." Wamsley testified that he was armed with a gun.

Martinez did not have the marijuana with him so Wamsley and Elmore followed Martinez to the house where the drug transaction was to take place. When they arrived at the house, Wamsley told Elmore stay in the car and wait while he went into the house with Martinez. He also told Elmore to call appellant and give him directions. Wamsley testified that Elmore and appellant were supposed to be his backup.

Wamsley testified he was in the house for about 45 minutes drinking beer and talking before the men arrived with the marijuana. They weighed the marijuana and the seller asked for the money. Wamsley walked to the porch and signaled Elmore to come in the house. Wamsley testified that Elmore walked in with a twelve-gauge shotgun in his hands so Wamsley pulled out his gun. Appellant followed Elmore into the house, carrying a

-6-

small, short-barrel twelve-gauge shotgun. Wamsley told Martinez to lie on the ground and pull out his pockets, and Wamsley took Martinez's phone. Wamsley testified that appellant fired a shot. Upon hearing the shot, Wamsley grabbed the drugs and ran out of the house. As he ran, Wamsley saw Duarte, who had been shot, fall down on the couch. Wamsley later testified he did not see appellant shoot Duarte, but appellant told him he did the shooting.

When Wamsley and Elmore got back to Bell's apartment, appellant was already there. Wamsley testified that he was "messed up" because he did not mean for anyone to get hurt and the robbery was not "supposed to go down like that." Wamsley had expected it to be an easy robbery because "drug dealers don't call the police." Wamsley yelled at appellant and asked him why he shot someone. Appellant told Wamsley he was defending him because "the dude" was moving toward Wamsley. Wamsley, Elmore, and appellant each took some of the marijuana. Wamsley was arrested about a week and a half later.

### C. Cell Phone Records

The trial court admitted into evidence detailed call records for cell phones belonging to Wamsley, Elmore, and appellant. Using both the information in these records and the cell towers with which each cell phone "communicated," Jeff Savage, an investigator with the Dallas District Attorney's office, determined the approximate locations of these three individuals when they used their cell phones on the day of the offense. Investigator Savage testified that he researched and summarized cell phone and text message records for the three phone numbers. He also prepared maps showing cell phone locations at given times during the day of the offense. Savage mapped the location of Wamsley's and Elmore's cell phones in the vicinity of Bell's apartment until 5:48 p.m. Wamsley's and Elmore's cell phone records showed movement, and from 6:56 p.m. until 7:25 p.m., they were in the vicinity of the McDonald's located at 175 and Buckner. Savage testified that at 6:54 p.m., appellant's cell phone was at the same location. Savage testified that during this period of time, the phone records reflect that Elmore and appellant switched phones. Telephone records indicate a call and text from Elmore's phone to appellant's girlfriend, and calls and texts from appellant's phone to Elmore's girlfriend. Savage further testified that from 7:36 p.m. to 9:11 p.m., all three cell phones moved to the scene of the murder.

The 911 call reporting the shooting was made around 9:12 p.m. Savage then mapped the line of travel for Wamsley, Elmore, and appellant, as

-7-

they drove north to the vicinity of 9600 Forest Lane and Natoya Bell's apartment. Savage was able to determine that Elmore traveled west from Soto's house, and then north on I-75, arriving at Bell's apartment at 9:53 p.m. Savage testified that based on Wamsley's telephone records, he appeared to be in the same car as Elmore. Savage also mapped appellant traveling north on LBJ Freeway, arriving at Bell's apartment at 9:34 p.m.

*Id.* at *1-*5.

The CCA denied Anderson's state habeas application without a written order on the findings of the trial court made without a hearing. *See Ex parte Anderson*, WR-81,637-01 (Tex. Crim. App. Nov. 19, 2014); *see also* Dkt. No. 12-13 (the CCA's decision) & Dkt. No. 12-18 at 7-15 (trial court's findings of fact and conclusions of law and state trial counsel's affidavit).

Anderson's timely Section 2254 application followed. *See* Dkt. No. 3. As in the state habeas proceedings, here, Anderson asserts four grounds for why his trial counsel was constitutionally ineffective and also claims that the evidence was insufficient to support his conviction.

**Legal Standards and Analysis**

<u>Sufficiency of the Evidence [Ground 5]</u>

Taking first Anderson's fifth ground for relief – that his right to due process under the Fourteenth Amendment was violated because "the evidence admitted at trial [was] insufficient to support a conviction for capital murder," Dkt. No. 3 at 8 – the undersigned begins by noting that on direct appeal Anderson argued that "the evidence is legally insufficient to support his conviction for capital murder," *Anderson*, 2013 WL 1819979, at *6. And the Court of Appeals considered and rejected this argument. *See*

*id.* at \*6-\*7 ("Reviewing all the evidence in the light most favorable to the jury's verdict, we conclude a jury could reasonably find from the evidence presented that the essential elements of capital murder were established beyond a reasonable doubt." (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011))). Because Anderson failed to file a petition for discretionary review, the CCA never considered this claim on direct review.

When Anderson presented his sufficiency claim to the state habeas trial court, that court found to be "not cognizable in a state habeas application." Dkt. No. 12-18 at 12 (citing *Ex parte McLain*, 869 S.W.2d 349, 351 (Tex. Crim. App. 1994)). *See also Bessire v. Quarterman*, No. 4:07-cv-597-Y, 2009 WL 54257, at \*2 (N.D. Tex. Jan. 8, 2009) ("Under Texas law, while an allegation of 'no' evidence is cognizable in a state habeas proceeding, a sufficiency-of-the-evidence claim may only be raised on direct appeal and may not be raised in a state habeas proceeding." (citing *West v. Johnson*, 92 F.3d 1385, 1389 n.18 (5th Cir. 1996); *Ex parte Grigsby*, 137 S.W.3d 673, 674 (Tex. Crim. App. 2004); *Clark v. Texas*, 788 F.2d 309, 310 (5th Cir. 1986); *McLain*, 869 S.W.2d at 350)).

That finding was affirmed by the CCA's disposition of Anderson's state habeas petition. *See Brantley v. Stephens*, No. 4:13-cv-883-A, 2014 WL 4960668, at \*3 (N.D. Tex. Oct. 4, 2014) ("The Texas Court of Criminal Appeals has confirmed that when a state habeas applicant challenges the sufficiency of the evidence in a state habeas application, and it subsequently disposes of the application by entering a denial without written order, the applicant's sufficiency claim was denied because the claim

is not cognizable." (citing *Grigsby*, 137 S.W.3d at 674)).

And where, like here, a habeas petitioner "raised his sufficiency-of-the-evidence claim on direct appeal" but "did not file a petition for discretionary review in the [CCA] raising the issue," and "in denying the claim without written order on postconviction habeas review, the [CCA] necessarily applied the bar to the claim," the CCA's "denial of the application was based on an independent and adequate state procedural ground such that his sufficiency claim is procedurally defaulted." *Id.* at *3 (citing *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir.2004); *Grigsby*, 137 S.W.3d at 674).

An exception to this procedural bar allows federal habeas review if a petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). But, because Anderson has failed to demonstrate cause and actual prejudice, and because he also has failed to assert the "fundamental miscarriage of justice" exception, the Court should deny this claim as procedurally barred.

<u>Ineffective Assistance of Counsel [Grounds 1, 2, 3, and 4]</u>

The Court reviews Sixth Amendment claims concerning the alleged ineffective assistance of counsel under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984); *see also Smith v. Robbins*, 528 U.S. 259, 285 (2000) ("the proper standard for evaluating [a] claim that appellate counsel was ineffective ... is that enunciated in *Strickland*" (citing *Smith v. Murray*, 477 U.S. 527, 535-36 (1986))).

Under *Strickland*, the petitioner must demonstrate that the performance of his

attorney fell below an objective standard of reasonableness. *See* 466 U.S. at 687-88. To be cognizable under *Strickland*, trial counsel's error must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. The petitioner also must prove that he was prejudiced by his attorney's substandard performance. *See id.* at 687, 692. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

> [B]ecause of the risk that hindsight bias will cloud a court's review of counsel's trial strategy, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."

*Feldman v. Thaler*, 695 F.3d 372, 378 (5th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689)).

"A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003). Moreover,"[j]ust as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Harrington v. Richter*, 562 U.S. 86, 110 (2011). "The Supreme Court has admonished courts reviewing a state court's denial of habeas relief under AEDPA that they are required not simply to give [the] attorney's the benefit of

the doubt, ... but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did." *Clark v. Thaler*, 673 F.3d 410, 421 (5th Cir. 2012) (internal quotation marks omitted).

To demonstrate prejudice, a habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington*, 562 U.S. at 111. "Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different," which "does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case." *Id.* at 111-12 (quoting *Strickland*, 466 U.S. at 693, 696, 697). "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.

Ineffective-assistance-of-counsel claims are considered mixed questions of law and fact and, therefore, are analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *See Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010). Where, as here, the state court adjudicated ineffective-assistance claims on the merits, this Court must review a habeas petitioner's claims under the "doubly deferential" standards of both *Strickland* and Section 2254(d). *Cullen v. Pinholster*, 563 U.S. 170,

190, 202 (2011). In such cases, the "pivotal question" for this Court is not "whether defense counsel's performance fell below *Strickland*'s standard"; it is "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101; *see also id.* at 105 ("Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." (internal quotation marks and citations omitted)).

In other words, AEDPA does not permit a *de novo* review of state counsel's conduct in these claims under *Strickland*. *See id.* at 101-02. Instead, on federal habeas review of a claim that was fully adjudicated in state court, the state court's determination is granted "a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* at 101; *see also Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (per curiam) (explaining that federal habeas review of ineffective-assistance-of-counsel claims is "doubly deferential" "because counsel is 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment'"; therefore, "federal courts are to afford 'both the state court and the defense attorney the benefit of the doubt'" (quoting *Burt v. Titlow*, 134 S. Ct. 10, 17, 13 (2013))).

Regarding Anderson's first claim, that counsel failed to convey a plea offer or advise Anderson to accept it, the state habeas court obtained a sworn affidavit from counsel Richard Franklin, in which Franklin testified that "[a]ll plea offers were

relayed to Anderson" and that Anderson "refused on his own and insisted on going to trial." Dkt. No. 12-18 at 13. The state court found Franklin to be credible and worthy of belief and then found that Anderson failed to show "that there was a reasonable probability that he would have accepted any plea bargain offer." *Id.* at 8 (citing *Ex parte Argent*, 393 S.W.3d 781 (Tex. Crim. App. 2013)). Considering these findings and sworn testimony, Anderson has not shown"that the state habeas court's conclusion on this claim amounted to an unreasonable application of *Strickland* or an unreasonable determination of the evidence." *Garza v. Stephens*, 738 F.3d 669, 680 (5th Cir. 2013) (citing 28 U.S.C. § 2254(d)(1)-(2)).

Through his second claim, Anderson alleges that his rights under the Confrontation Clause were violated by – and counsel was therefore constitutionally ineffective because – counsel failed to object to (1) a police detective's testimony that when he called a certain phone number the person answering identified the number as belonging to Anderson and (2) the testimony of Phaylon Wamsley, one of Anderson's accomplices, concerning what another accomplice had told Anderson about the plan to commit a robbery. As to the detective's testimony, the state habeas court found that there was other testimony – including Anderson's own admission to that detective – linking Anderson to the phone number. And, as to the Wamsley's testimony, that court found that Wamsley himself testified that he told Anderson about the plan. *See* Dkt. No. 12-18 at 8-9. Given this corroborative testimony, the state habeas court concluded that Anderson could not demonstrate that he was prejudiced by any failure to object to the testimony at issue. Such a conclusion is also not an unreasonable application of

*Strickland* or an unreasonable determination of the evidence.

Anderson's third claim is that his counsel should have argued that a search warrant was required to obtain ceratin of his cell phone records – "records from the phone company establishing location information from cell towers for certain designated phone numbers, including one purporting to belong to [Anderson]." Dkt. No. 12-18 at 10. The state habeas court concluded that Anderson failed to show that a motion to suppress based on this argument would have been successful – thus precluding a showing of prejudice under *Strickland* – because "courts in Texas have repeatedly held that no warrant is required and no Fourth Amendment violation occurs when cell phone location information is obtained from a third party." *Id.* at 10-11 (citation omitted). This conclusion is also not an unreasonable application of *Strickland* or an unreasonable determination of the evidence.

Anderson's final argument for why his trial counsel was unconstitutionally ineffective is that counsel failed to request a jury charge on defense of third persons. But, as counsel explained in his affidavit, "[t]he parties were armed and committing a robbery they had planned. Self defense or defense of a third party were not available." Dkt. No. 12-18 at 13. The state habeas court agreed –

> [A]t best, [Anderson] knew that he was engaging in an illegal drug transaction, and there was sufficient evidence found by both the jury and the appellate court, that Applicant knew he was participating in a robbery. The Court finds that [Anderson] was not entitled to a jury charge of defense of a third person. Thus, counsel was not deficient in failing to request such a charge.

Id. at 11. This conclusion, too, is not an unreasonable application of *Strickland* or an

unreasonable determination of the evidence.

The Court should therefore also deny these four claims.

### Recommendation

The Court should deny the application for writ of habeas corpus.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: August 30, 2016

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE